## IN THE UNITED STATES DISTRICT COURT OF DELAWARE

| | |
|---|---|
| DAQWAN RILEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No.: _____ |
| v. ) | |
| ) | |
| NATIONAL RAILROAD PASSENGERS ) | JURY TRIAL DEMANDED |
| CORPORATION d/b/a AMTRAK, ) | |
| ) | |
| Defendant. ) | |

## **COMPLAINT**

## **INTRODUCTION**

1.   Plaintiff, Daqwan Riley, ("Plaintiff"), files this action against Defendant, National Railroad Passengers Corporation and d/b/a Amtrak, ("Defendant" or "Amtrak"), for compensatory and punitive damages for violations of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981 for rights secured by the Fourteenth Amendment for back pay, front pay, compensatory damages, punitive damages and attorney fees and costs.

## **NATURE OF THE ACTION**

2.   Plaintiff began his employment with Defendant on December 17, 2021.

3.   Defendant Amtrak wrongly discriminated against Plaintiff due to his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended ("Title VII") and 42 U.S.C. § 1981.

4.   Defendant's procedures, policies and administration of same denied Plaintiff of his substantive and procedural rights in violation of the Fourteenth Amendment and thereby caused him harm.

## JURISDICTION

5. This Court has federal question jurisdiction over this cause of action pursuant to 28 U.S.C. § 1331.

6. Venue is proper in this district pursuant to 29 U.S.C. § 1331, as well as 28 U.S.C. § 1391(b).

## PARTIES

7. Plaintiff is a resident of Wilmington, Delaware, who at all times relevant to this Complaint was an employee of Defendant Amtrak.

8. Defendant Amtrak is a corporation duly existing under the laws of the District of Columbia with a principal place of business located at 400 N. Capitol Street, N.W., Washington, DC.

9. At all material times hereto, Defendant has locations and offices in the State of Delaware.

10. Defendant provides passenger rail service to more than five hundred stations in forty four states. Defendant maintains actual and/or constructive control, oversight, and/or direction over all its operations at all of its various locations, including employment policies, practices, procedures to be utilized and adhered to at all locations within Amtrak.

11. The acts set forth in this Complaint were authorized, ordered and/or done by Defendant's officers, agents, employees, and or representatives while actively engaged in the management of Defendant's business.

## ADMINISTRATIVE PROCESS

12. On December 22, 2022, Plaintiff filed a timely Charge of Discrimination with the Delaware Department of Labor ("DDOL") and U.S. Equal Employment Opportunity Commission ("EEOC") alleging race discrimination and retaliation against Defendant Amtrak.

13. On July 13, 2023, Plaintiff received a "Final Determination and Right to Sue Notice" from the DDOL, attached hereto as *Exhibit A*.

14. On August 18, 2023, Plaintiff received a "Final Determination and Right to Sue Notice" from the EEOC, attached hereto as *Exhibit B*.

15. Plaintiff has satisfied all statutory prerequisites for filing this action.

## FACTS

### Summary of Plaintiff's Employment

16. Plaintiff began his employment with Defendant Amtrak on December 17, 2021, in the position of Communications Signals Helper ("C&S Helper") in Lancaster, Pennsylvania.

17. A C&S Helper assists signal maintainers with the repair, maintenance, and construction of signal equipment, *ie.* electric switch machines, crossing equipment, and wayside signals for Amtrak. A C&S Helper installs, maintains, replaces and repairs electrical, electronic, and mechanical communications equipment including power sources, circuits, switching equipment and transmission facilities to the T-1 level. A C&S Helper also installs CCTV and Intrusion detection systems and troubleshoots all kinds of communications equipment in order to analyze and isolate malfunctions. This work involves digging, trenching, painting, wiring and cabling at both inside and outside locations and being a watchman when required. The C&S Helper also operates company vehicles in the performance of their duties as required.

18. Shortly after Plaintiff began reporting to Lancaster, Mr. Harrison Meyers stated to Plaintiff, "You don't look like a C&S guy." In response Plaintiff asked, "What does a C&S guy look like?" The other employees laughed. Given that Plaintiff was the only African American in the room, the inference was clearly about his race.

19. Plaintiff was one of two African Americans working on the crews.

20. The other African American, believed to be Aaron Jones, transferred within a month.

21. Plaintiff was one of six helpers who started at the same time.

22. The working atmosphere was "odd." Plaintiff was excluded from conversations. He did not feel comfortable with the "crew." There was a racial undertone. Questions of a personal nature were directed to his "culture" or perceived "culture."

23. Plaintiff was repeatedly questioned about why he chose C&S by Mr. Meyers. "Where are you from? Do you have family here? How did you get in Amtrak?"

24. If during downtime, a white helper asked to work on a piece of equipment or had questions, other employees would grant permission or respond to the question.

25. In contrast, Plaintiff's requests were denied, and he was told, "we are not doing that right now" or "we will get to that later."

26. While on assignment in a dump truck with Mr. Steven Loretto, a Caucasian Maintainer, Mr. Loretto pulled out his cell phone to show Plaintiff a Dave Chappelle skit, entitled "Clayton Bigsby." The comedy sketch concerned a black "white supremacist." In the skit, the comedian is wearing a KKK hood and robe and repeatedly uses the "N" word. Mr. Loretto showed Plaintiff two portions of the skit and asked Plaintiff: "Don't you think this is funny?" Plaintiff was not amused and was offended. Plaintiff responded, "no." The entire C&S "gang," notably all white,

was present during this incident. A few men walked over to look at the video when asked if they ever have seen it. They chuckled and looked at Plaintiff who was standing there clearly offended.

27. Despite repeatedly telling his crew members he did not think this was funny and expressing his discomfort, the crew members continued to play racially motivated comedy clips in Plaintiff's presence on multiple occasions.

28. Mr. Dave German, the Caucasian Foreman assigned the crews, made no attempt to converse with Plaintiff in contrast to his conversations with the Caucasian helpers.

29. On May 15, 2022, an article on LancasterOnline reported there were 72 documented Hate Crimes in Pennsylvania before May of that year. There were 284 for 2021 and 111 in 2020. This article notes that there are very few convictions for ethnic intimidation. In fact, most counties failed to even report these types of incidents to the State police. The article cites a nationwide increase in hateful language. It was noted that as expressions of hatred or dismissiveness increased so did acts of violence or acts connected to hate.

30. The Philadelphia Anti-Defamation League noted more hateful propaganda in Pennsylvania in 2021 than in any other state nationwide. The Southern Poverty Law Center noted that Pennsylvania had the 5th highest amount of active hate groups. There were 72 groups.

31. The FBI 2021 Hate Crime Statistics noted an 11.6% increase of reported hate crimes. It was noted that 63.1% of single bias incidents were motivated by the offenders' bias toward race/ethnicity/ancestry. Anti-Black or African American hate crimes were the largest incident category.

32. Plaintiff, as an African American, was well aware of the anti-black bias as having witnessed same with increasing frequency in 2021 and into 2022 in the communities in which he worked and lived. It is in this context that Plaintiff began working in Lancaster in December 2021.

5

33. During this time, Plaintiff was a probationary employee in a 90-day period.

34. The Caucasian helpers during bad weather and whenever they wanted would decline more dangerous tasks, *e.g*., climbing bridges. Plaintiff felt that he would receive more criticism or derogatory indication in his evaluation so when chosen he undertook the task(s). In other circumstances, Plaintiff was given no choice but to perform the dangerous tasks. When assigned the task, the Caucasian helper would say, "glad it's you and not me" or "rather you than me."

35. At times, Plaintiff's supervisors were highly critical of his work, but the same job performed by Caucasian helpers received praise, such as, "that is pretty good." In contrast, the comments toward Plaintiff were a grunt followed by "ok" or "this is not the time."

36. Plaintiff was assigned more of the manual labor tasks and received little training when compared to the Caucasian helpers.

37. Often Mr. German, Mr. Joshua Effrece, Mr. Meyers and another maintainer traveled together in the same truck.

38. In approximately January 2022, the truck most often used by the Foreman, Mr. German, was sent for service. This truck was not equipped with a dash cam. Mr. German was told that the truck had to be equipped per Amtrak policy with a dash cam in the near future.

39. However, the vehicle was not removed from service pending the installation of the dash cam.

40. Notably, Mr. German did not use the truck again, but he permitted others to use it, despite Amtrak's policy which prohibited said use.

41. On February 24, 2022, Plaintiff was assigned by Mr. German to ride with Michael Sabra and Mr. Effrece. Mr. German assigned intentionally assigned then a vehicle which he knew was not equipped with a dash cam.

42. When the tasks for the day were completed, Plaintiff was last to enter into the truck. He slid into the backseat. The truck was the one without the dashcam camera. The only truck in the Lancaster location without a dashcam. All the crew were aware that without a dashcam in the truck, any behavior in the interior of the truck could not be observed by Amtrak.

43. Mr. Sabra and Mr. Effrece were aware the vehicle they were in on February 24, 2022, was not equipped with a dashcam.

44. Mr. Sabra was driving and Mr. Effrece was in the front passenger seat. Once Plaintiff entered the vehicle, Mr. Effrece was ready to play a song on his cell phone.

45. The lyrics of the song repeated the word "N----" Then Mr. Effrece said, "you know what this song is, yeah," and recited the words, "yeah theses N---- got you F----- up, right, right D, right." Mr. Effrece was laughing and Mr. Sabra smiled and chuckled. At no time did Mr. Sabra intervene or apologize to Plaintiff afterwards.

46. Part of the interaction was recorded by Plaintiff. Plaintiff recorded the interaction because during previous interactions with other employees, he was told that they did not have to stop the offensive behavior due to the lack of internal/external cameras with audio Lytx systems in this vehicle. Plaintiff was frightened and humiliated by their treatment of him.

47. Following the incident, Plaintiff perceived the message don't speak out or else. Plaintiff was humiliated, but feared the next time would be worse.

48. Fearful of further retaliation if he complained to anyone at Amtrak and apprehensive of job security, Plaintiff did not voice a complaint after this date while in Lancaster.

7

49. Plaintiff was subjected to daily discriminatory behavior in front of Defendant's supervisors, managers, and foremen, who failed to take any corrective action.

50. Because management continued to allow this discriminatory behavior to continue without any consequence, Plaintiff felt powerless to complain.

51. Plaintiff recognized the only way to prevent additional discriminatory abuse was to transfer out of this location because any complaints made would be adversely held against him as he was a probationary employee.

52. It was evident by comments and statements that he was being discriminated against due to his race. Maintainers who supervised Plaintiff's work made racially offensive comments, played racially offensive videos, and made racially charged statements in the presence of Plaintiff's supervisor, Mr. German, the Foreman.

53. Mr. German, acquiesced with the racially discriminatory conduct of his subordinates, by failing to take any corrective actions about Plaintiff's co-workers discriminatory behavior.

54. Mr. German's continued failure to act further perpetuated the racially hostile work environment to which Plaintiff was exposed.

55. Defendant's Supervisors/Maintainers permitted Caucasian helpers with the same level of experience to learn and grow in the craft and at the same time denied Plaintiff the same opportunities.

56. Further, Caucasian helpers were assigned less strenuous tasks or less dangerous tasks. In fact, the Caucasian helpers would often decline a dangerous or unpleasant task which would then be assigned to Plaintiff. Plaintiff, wanting to be accepted and not wishing any discipline during his period of probation, completed the assigned tasks.

57. Due to the racially charged hostile work environment, Plaintiff was forced to seek a transfer.

58. It was evident from the supervisors' failure to intervene or discipline the employees for their discriminatory behavior that the racially hostile environment would continue.

59. The supervisors' and coworkers' acceptance of the continued racially charged hostile work environment confirmed reporting the behavior would not change anything.

60. On or about July 11, 2022, Plaintiff's transfer to another craft was approved, and he was assigned to Wilmington, DE.

61. This transfer resulted in a constructive demotion because Plaintiff lost seniority and had to begin a new craft in another division, which resulted in a lower hourly rate.

62. As a result of the forced transfer, Plaintiff's position was abolished and displaced. Plaintiff then had to find a vacancy in the track department and is subject to seniority placement. This has happened multiple times. At C&S, this displacement would not have occurred, and his position would have been secure. Plaintiff has lost income as a result of this forced transfer. He had to start over, including starting a 90-day probation for the new craft.

63. Plaintiff performed highly during his employment.

64. During his employment with Defendant, Plaintiff experienced depression, anxiety, humiliation, self-esteem issues and stress which was a direct result of the hostile work environment and racial discrimination.

65. Plaintiff was fearful of further retaliation and of losing his employment. He was intimidated.

66. The conduct in Lancaster was condoned by the Foreman, Mr. German, inflicted by his direct supervisors, the maintainers, as well as other helpers.

67. As a result of the discriminatory behavior of his co-workers and his immediate supervisors, Plaintiff felt uncomfortable and excluded. He did not feel supported and was concerned about his safety. As a result, he was vigilant of his surroundings and kept to himself as much as possible. Although Plaintiff was excited by the start of a new career when he started in December 2021, he no longer had the felt excited and instead, dreaded work.

68. No other African American employees were on the "gang" during Plaintiff's tenure at Lancaster.

69. On November 3, 2022, Plaintiff officially reported to his supervisors, Aaron Johnson, Kenya White, Joshua Bixler, and Ernest McWhite the discrimination and hostile work environment.

70. He completed a written statement and based upon information and belief, Human Resources "opened" an investigation on or about November 7, 2022.

71. However, Defendant continued its racially hostile work environment through retaliation, fear and intimidation by threatening Plaintiff with criminal prosecution because he videotaped the February 24, 2022, incident.

72. Defendant does not treat complaints from Caucasian employees in the same manner. Rather complaints by Caucasian employees against African American employees are encouraged and met with swift and immediate action against African American employees. Caucasian employees are not threatened with criminal prosecution of perjury for possibly providing false information.

73. It was apparent to Plaintiff that Defendant was more interested in protecting the Caucasian employees' "rights" rather than taking corrective action against those employees who

sang and taunted the racially offensive statements in direct violation of Amtrak's stated policy of a "respectful and non-discriminatory workplace."

74. Even though Plaintiff provided Defendant with direct evidence of Caucasian employees making racially offense comments, Defendant claimed Plaintiff's complaint had no corroboration. In a further act to protect its Caucasian employees, Defendant claimed it could not consider the video provided by Plaintiff because it was taken in violation of state law.

75. Defendant did not want to investigate Plaintiff's complaint and made every effort to dissuade him from pursuing it, including but not limited to, threatening him with criminal prosecution and improperly disqualifying evidence.

76. By claiming Plaintiff's actions constituted a felony, Amtrak was further condoning the discriminatory actions of the perpetrators and re-affirming the statements they "did not have to stop the offensive behavior due to the lack of internal/external cameras with audio Lytx systems in this vehicle."

77. Threatening Plaintiff with committing a felony is further evidence of Defendant's attempts at intimidation, retaliation and continued harassment towards Plaintiff because of his race and because of his engagement in protected activity.

78. Additionally, there appeared to be no concern that Amtrak's policy concerning the Lytx system was disregarded and the reasons for same were disregarded.

79. Amtrak permitted a vehicle to be used without internal/external cameras with audio Lytx systems mandated by Amtrak policy. Further, Mr. German allowed the use of the vehicle in direct contravention of the Amtrak policy. This was never investigated and is further evidence of Amtrak's systemic racial bias.

11

80. Based upon information and belief, Mr. Sabra initially denied the incident, but later admitted he was present.

81. Despite Mr. Sabra's failure to report and selective memory regarding the incident, he was not charged or investigated. It is undisputed Mr. Sabra failed to take any action either during the incident or immediately thereafter to prevent the continued racially hostile work environment. His failure to report was not held against him. No charges were brought against him.

82. In a further act of discrimination, Defendant only agreed to pursue charges against Mr. Effrece once Mr. Sabra came forward. Plaintiff's recollection and video evidence was purportedly insufficient to charge Mr. Effrece. Yet another example of discrimination and treating the word of a Caucasian employee with more value and credibility than that of an African American.

83. The investigation of Plaintiff's complaints was superficial at best.

84. Based upon the summary provided by Amtrak, it appears no questions were asked as to why this vehicle was permitted to be used without the Lytx system, who permitted the use, and there was no questioning of the Mr. German.

85. Further, the statement Plaintiff provided appeared not to have been read thoroughly before the investigation. As Amtrak indicated, the first time the dangerous tasks were mentioned was during an interview with Plaintiff in January. However, Plaintiff's statement in fact noted it.

86. This lack of adequate investigation and remedial action is part of Defendant's systemic discrimination against African American employees.

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims against Defendant.

### COUNT I
### Discrimination Based on Race and Hostile Work Environment and Retaliation in Violation of the Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*)
*Against Defendant Amtrak*

87. Plaintiff hereby restates and incorporates by reference paragraphs 1 through 86 as if fully restated herein.

88. Defendant Amtrak employs fifteen or more employees and is an "Employer" as defined by 42 U.S.C. § 2000e(b).

89. At all times relevant hereto, Plaintiff was employed by Defendant Amtrak and is an "Employee" as defined by 42 U.S.C. § 2000e(f).

90. Plaintiff received a Right to Sue letter from the EEOC on August 18, 2023. Plaintiff has satisfied all statutory prerequisites for filing this action.

91. Title VII makes it unlawful for an employer to discriminate against any individual with respect to compensation or terms, conditions, or privileges of employment based on race.

92. Plaintiff, an African American male, is a member of a protected class.

93. Plaintiff was qualified for the position of C&S Helper.

94. Plaintiff suffered an adverse employment action when he was subjected to a racially hostile work environment and was constructively demoted when he was forced to transfer out of the C&S Division.

95. Amtrak has a racial bias and general policy of discrimination that infects personnel decisions which fosters and creates a hostile work environment.

96. While Amtrak touts a "Zero Tolerance" policy, African American employees do not see that policy/phrase reflected in how they are treated at Amtrak's workplace.

97. There is a pattern and practice of discrimination against African American employees at Amtrak.

98. There is a low and disproportionate number of African American employees, in its executive ranks which further perpetuates acts of discrimination.

99. Defendant has failed to properly monitor, supervise and train its managers and employees on discrimination and diversity.

100. At the Lancaster location, there was inadequate supervision of employees and supervisors which resulted in discriminatory conduct being unchecked and not corrected.

101. Plaintiff, as an African American, was treated differently than the Caucasian helpers who were included in conversations, given opportunities to train on equipment, have questions answered and permitted to learn the craft.

102. Plaintiff was subjected to racial comments, shown racial videos, and forced to listen to a racially derogatory song.

103. Management knew that Amtrak's policy was that all company vehicles have the Lytx system but permitted Plaintiff and two helpers to use the only vehicle without the system.

104. Plaintiff was told by his co-workers and other maintainers that anything could happen in the vehicle because it was not under surveillance. "There is no eye in the sky." Statements like these were made to intimidate, humiliate and degrade Plaintiff, the only African American, in the "gang."

105. Amtrak knew about, or should have known about, and failed to investigate and/or thoroughly investigate, prevent, or remedy the conduct described herein.

106. The acts of harassment described herein were sufficiently severe or pervasive as to alter the conditions of Plaintiff's employment, thus creating a hostile work environment.

107. Amtrak failed to take steps to discourage racial discrimination or the discriminatory hostile harassing environment and did nothing. There has been no training or meetings on the issues of racism, inclusion diversity, culture sensitivity, or tolerance while Plaintiff was in Lancaster.

108. Defendant's investigation was inadequate and superficial.

109. Caucasian helpers in Lancaster were not subjected to this hostile work environment and thus did not have to transfer out of their craft in order to leave the intolerable situation.

110. Caucasian employees were not threatened or demeaned by the racism.

111. Amtrak has clearly developed a policy involving failing to investigate the incidents, hold the culprits accountable, or provide training or meetings for employees and managers. The number of legal actions for discrimination, including a class action which has been ongoing for 20 years, is evidence of this policy as almost all contain similar allegations.

112. The subjective decision making involves an unconscious bias by individuals at Amtrak that have power and authority to render such decisions. For instance: work assignments, training and opportunities are therefore more often provided to Caucasian employees thereby disadvantaging African American employees.

113. Defendant's conduct, as alleged above, violated and continues to violate Title VII. Defendant's liability is based on the following:

    a) Harassment of Plaintiff and/or creating and facilitating a hostile work environment on the basis of Plaintiff's race and maintaining a hostile work environment;

      b) Failure to take all reasonable steps to prevent discrimination and harassment based on race;

      c) Retaliation/Intimidation against and of Plaintiff who, when he objected to the treatment, was subjected to further humiliation which was condoned by Amtrak Supervisors.

114. Title VII requires employers to take reasonable steps to stop harassment. This requires an investigation, deciding on appropriate consequences, and follow through to ensure the behavior stops.

115. During the course of Plaintiff's employment, Defendant failed to prevent the employees, Foreman, and supervisors/maintainers from making racial comments, showing racial videos, treating Plaintiff differently due to his race. Defendant failed to take all reasonable steps to prevent a pattern/practice of racial discrimination and failed to take reasonable steps designed to lessen and/or eliminate racism at the Lancaster location.

116. Amtrak's management, including a senior engineer who oversees Lancaster, was aware of the discriminatory attitudes and toxic environment.

117. Plaintiff believes, and on that basis, that the race of black employees, including him, was the motivating factor for the racist conduct that Defendant's' racist employees engaged.

118. As a proximate result of Defendant's willful, knowing and intentional harassment against Plaintiff, Plaintiff has suffered and continues to suffer economic damages and compensatory damages for emotional distress, and mental pain and anguish.

## COUNT II
### Racial Discrimination, Racial Harassment (Hostile Work Environment) in Violation of 42 U.S.C. § 1981

119. The allegations of Paragraphs 1 through 118 are incorporated by reference as if fully restated herein.

120. As an African American male, Plaintiff is a member of a protected class.

121. At all relevant times herein, Plaintiff was in a contractual relationship with Defendant within the meaning of 42 U.S.C. § 1981, as amended.

122. During the course of Plaintiff's employment, Defendant violated Plaintiff's rights by depriving Plaintiff of his right to the enjoyment of all benefits, privileges, terms, and conditions of Plaintiff's employment contract "as is enjoyed by white citizens," in direct violation of 42 U.S.C. § 1981(b).

123. Specifically, Amtrak's employees and supervisors subjected Plaintiff to racial harassment, racial discrimination, and a racially hostile work environment, resulting in Plaintiff having to transfer and be constructively demoted and as well as conducting an inadequate investigation of the harassment and discrimination.

124. Amtrak failed to thoroughly investigate the facts and circumstances of Plaintiff's complaint and failed to discipline those responsible, which is part of Amtrak's pattern and practice of racial discrimination and harassment.

125. Amtrak permitted employees to retaliate and intimidate Plaintiff by placing him in a vehicle without a Lytx system, perpetuating racial discrimination during the entire time Plaintiff was in Lancaster.

126. Amtrak acted intentionally to discriminate against Plaintiff. Plaintiff's supervisors permitted racism during interactions with the crew and Plaintiff. Amtrak knew of the racist

behavior and attitudes, failed to remediate or change the cultural bias and toxic environment, or conduct a thorough, prompt and impartial investigation and/or discipline the culprits who acted with the purpose to intimidate and harass Plaintiff and others. Further, Amtrak management, and/or supervisors knew of the unfair treatment and discriminatory attitudes and failed to act or report thereby condoning said behavior.

127. Amtrak failed to prevent the racially harassing and retaliatory behavior directed at Plaintiff and others. As a result, Plaintiff was forced to transfer and leave the C&S Division.

128. Amtrak took no remedial action regarding discrimination and has, by the failure to take action, intensified and perpetuated the discrimination by Amtrak representatives.

129. The incidents suggest racially motivated bias and internal statistical data will show that African American employees are disfavored and disproportionately affected by these acts and policies as compared to Caucasian employees.

130. Through their actions and treatment of Plaintiff, Amtrak, by its employees and supervisors, intended to discriminate against Plaintiff on the basis of his race.

131. Defendant's racial harassment and discrimination denied Plaintiff the right to enjoy the fruits of his contractual relationship.

132. Amtrak's violation of 42 U.S.C. § 1981, as amended, caused Plaintiff to suffer harm as set forth above.

133. As a result of the unlawful acts of Amtrak, Plaintiff is entitled to damages as set forth herein.

134. Defendant Amtrak engaged in the acts alleged herein maliciously, fraudulently, and oppressively, with wrongful intention of injuring Plaintiff; with conscious disregard of the rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

A. Declare the conduct by Defendant to be in violation of Plaintiff's statutory rights and common law rights.

B. Award Plaintiff any and all consequential damages, including, but not limited to lost wages, salary, employment benefits, back pay, front pay, pre and post judgment interest, equity, emotional distress damages, punitive damages and any or all pecuniary damages.

C. Award Plaintiff all compensation due as a result of Defendant's' violations herein.

D. Award Plaintiff an equal and additional amount as liquidated and punitive damages.

E. Award Plaintiff costs and reasonable attorney's fees.

F. Award Plaintiff pre and post judgment interest at the legal rate.

G. Any and all such other relief as the Court deems appropriate under the circumstances.

**ALLEN & ASSOCIATES**

*/s/ Michele D. Allen*
Michele D. Allen (#4359)
Delia Clark (#3337)
4250 Lancaster Pike, Suite 230
Wilmington, DE 19805
302-234-8600
302-397-3930 (fax)
michele@allenlaborlaw.com
delia@allenlaborlaw.com
*Attorneys for Plaintiff*

Dated: October 9, 2023